# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS PAUL WEST; GREGORY
DICKENS; CHARLES M. HEDLUND;
ROBERT W. MURRAY; THEODORE
WASHINGTON; TODD SMITH,
              *Plaintiffs-Appellants,*

                  v.

JANICE K BREWER, Governor of
Arizona; CHARLES L. RYAN,
Director, Arizona Department of
Corrections; ERNEST TRUJILLO;
CARSON MCWILLIAMS, Warden,
Arizona Department of
Corrections- Florence; UNKNOWN
PARTIES, named as Does 1-50,
              *Defendants-Appellees.*

No. 11-16707

D.C. No.
2:11-cv-01409-
NVW
District of Arizona,
Phoenix

ORDER

Filed July 18, 2011

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw, and
Consuelo M. Callahan, Circuit Judges.

## COUNSEL

For petitioner-appellant West: Jon M. Sands, Arizona Federal
Public Defender, Dale Baich (argued), Robin C. Konrad,
Assistant Arizona Federal Public Defenders, Phoenix, Arizona.

For respondent-appellant Ryan: Thomas C. Horne, Attorney
General, Jonathan Bass (argued), Assistant Attorney General,
Tucson, Arizona.

## **ORDER**

Thomas Paul West is scheduled to be executed by the State of Arizona tomorrow, July 19, 2011. Last night, the district court denied West's Emergency Motion for Temporary Restraining Order or Preliminary Injunction in which West sought to temporarily stay his execution. West filed a notice of appeal, and this morning filed an Emergency Motion Under Circuit Rule 27-3 for an Injunction. We deny his emergency motion.

In order to obtain preliminary injunctive relief, West must show "(1) that he is likely to succeed on the merits of such a claim, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Beaty v. Brewer*, ___ F.3d ___, 2011 WL 2040916, * 6 (9th Cir. May 25, 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct 365, 374 (2008). As we did in *Beaty*, "[w]e acknowledge that [West] has a strong interest in being executed in a constitutional manner, but he has not shown that this interest is threatened in this case." *Id.* West has not shown that the manner in which Arizona intends to execute him "creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives." *Baze v. Rees*, 553 U.S. 35, 61 (2008).

The court heard telephonic oral argument on this matter today. At argument, Arizona's counsel made several representations. First, he represented that Arizona's protocol for carrying out executions, a relevant portion of which is attached as Exhibit A to this order, had been followed in the past and, more importantly, will be followed in West's execution. Specifically, he represented that the drugs called for in the protocol are available in the State's possession, and will be used in West's execution. Moreover, he represented that the protocol will be followed regarding the locations and order of prefer-

ence for insertion sites as detailed in Paragraph G of the protocol.

For the reasons expressed by the district court, reinforced by the representations made by Arizona's counsel at oral argument, we conclude West has failed to satisfy his burden to demonstrate a substantial risk of severe pain by the method Arizona intends to use to execute him. *Baze*, 553 U.S. at 61. Accordingly, West's motion is **DENIED**.

# EXHIBIT A

ATTACHMENT F
DEPARTMENT ORDER 710
Page 1 of 9

### PREPARATION AND ADMINISTRATION OF CHEMICALS

A. Confidentiality and Involvement

1. The anonymity of all personnel who participate in or perform any ancillary function(s) in the execution and any information contained in records that would identify those persons are, as required by statute, to remain confidential and are not subject to disclosure. A.R.S. 13-757.

2. All team members serve on a strictly voluntary basis. At any point before, during or after an execution any team member may decline to participate or participate further without additional notice and explanation or repercussion.

3. The Division Director for Offender Operations shall ensure that all team members understand and comply with the provisions contained herein.

B. Medical Team Members – Selection and Training

1. The Medical Team consists of: physician(s), physician assistant(s), nurse(s), emergency medical technician(s), paramedic(s), military corpsman, phlebotomist(s) or other medically trained personnel including those trained in the United States Military. All team members shall have at least one year of current and relevant professional experience in their assigned duties on the Medical Team. Two Medical Team members (IV team) will be assigned the responsibility of inserting the IV catheters.

2. The Medical Team members shall be selected by the Division Director for Offender Operations with the approval of the Director. Selection of the team members shall include a review of the proposed team member's professional qualifications, training, experience, professional license(s) and certification(s), criminal history, and personal history interview. Licensing and criminal history reviews shall be conducted, prior to contracting, annually and upon the issuance of a Warrant of Execution.

3. The Division Director for Offender Operations, with the approval of the Director, shall designate the Medical Team Leader. The Division Director for Offender Operations and the Medical Team leader shall ensure that all team members thoroughly understand all provisions contained herein as written and by practice.

4. The Medical Team shall be responsible for inserting the IV catheters, ensuring the line is functioning properly throughout the procedure, mixing the chemicals, preparation of the syringes, monitoring the inmate (including the level of consciousness and establishing the time of death) and supervising the administration of the chemicals, as well as other duties that may be assigned by the Director.

5. IV Medical Team members and non-medically licensed team members shall participate in a minimum of ten (10) execution rehearsals per year with the Special Operations Team.

6. The Division Director for Offender Operations and the Medical Team leader shall ensure that all team members thoroughly understand all provisions contained herein as written and by practice.

7. Any documentation establishing qualifications, including training of the team members, shall be maintained by the Department Director or designee.

EFFECTIVE: JUNE 10, 2011

ATTACHMENT F
DEPARTMENT ORDER 710
Page 2 of 9

C. Special Operations Team Members – Selection and Training

1.  The Special Operations Team consists of a minimum of seven team members and a Team Leader.

2.  The Special Operations Team shall be selected by the Division Director for Offender Operations with the approval of the Director. Selection of the team members shall include a review of the proposed team member's qualifications, training, experience, personnel file (if applicable), criminal history, and personal interview. Criminal history and personnel file reviews shall be conducted annually and upon issuance of a Warrant of Execution. Additional selection criteria are set forth in DO-710.

3.  The Division Director for Offender Operations, with the approval of the Director, shall designate the Special Operations Team Leader. The Special Operations Team Leader, with the approval of the Division Director for Offender Operations, will designate the team member that will serve as the Recorder, the team member that will operate and monitor the video/audio equipment and the team members that will dispense the chemicals as described herein.

4.  The Special Operations Team shall be responsible for monitoring the inmate and the IV lines, operation and monitoring the video/audio equipment, observing the preparation and placement of the syringes, administering the chemicals as well as other duties that may be assigned by the Director.

5.  The Special Operations Team shall participate in a minimum of ten (10) execution rehearsals per calendar year. All team members shall have participated in at least two (2) execution rehearsals prior to participating in an actual execution. In the event that a Warrant of Execution is issued, the Special Operations Team will train weekly up to the date of the execution.

6.  The Division Director for Offender Operations and the Special Operations Team leader shall ensure that all team members thoroughly understand all provisions contained herein as written and by practice. All team members will be trained to perform all Special Operations Team duties.

7.  Any documentation establishing qualifications, including training of all team members, shall be maintained by the Department Director or designee.

D. Obtaining Chemicals and Equipment

1.  Upon receipt of the Warrant of Execution, the Division Director for Offender Operations or designee shall:

    i.   obtain the inmate's weight, ascertain the inmate's primary language, identify any special accommodations,
    ii.  ensure IV Team member(s)/ASPC-Eyman medical staff physically inspect the inmate to predetermine appropriate venous access locations,
    iii. consult with Medical Team members regarding the equipment for the procedure and ensure all equipment necessary to properly conduct the procedure is on site, immediately available for use and functioning properly,
    ii.  ensure that all backup medical equipment, including a backup electrocardiograph and two complete sets of backup chemicals, are on site, immediately available for use and functioning properly, and
    iii. ensure the chemicals are ordered, arrive as scheduled and are properly stored. The chemicals shall be stored in a secured locked area that is temperature regulated and monitored to ensure compliance with manufacturer specifications, under the direct control of the Housing Unit 9 Team Leader.

E. Preparation of Chemicals

1.  At the appropriate time, the Housing Unit 9 Section Leader shall transfer custody of the chemicals to the Medical Team Leader, in order for the Medical Team to begin the chemical and syringe preparation in the chemical room, as assigned and supervised by the Medical Team Leader.

ATTACHMENT F
DEPARTMENT ORDER 710
Page 3 of 9

2. The Medical Team Leader will assign a Medical Team member to prepare each chemical and the corresponding syringe. The Medical Team Leader will supervise the process. The assigned Medical Team members shall prepare their designated chemical and syringes for a total of three complete sets of chemicals. One full set of syringes is used in the implementation of the death sentence and two full sets are to be available and ready for use as backup.

3. The assigned Medical Team member shall be responsible for preparing and labeling the assigned sterile syringes in a distinctive manner identifying the specific chemical contained in each syringe by i) assigned number, ii) chemical name, iii) chemical amount and iv) the designated color, as set forth in the chemical chart below. This information shall be preprinted on a label, with two labels affixed to each syringe to ensure a label remains visible.

**CHEMICAL CHART SET 1**

| Syringe No. | Label |
|---|---|
| 1A | 1.25gm Sodium Pentothal/or Pentobarbital, GREEN |
| 2A | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 3A | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 4A | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 5A | 60mL Heparin/Saline, BLACK |
| 6A | 60mg Pancuronium Bromide, BLUE |
| 7A | 60mg Pancuronium Bromide, BLUE |
| 8A | 60mL Heparin/Saline, BLACK |
| 9A | 120mEq Potassium Chloride, RED |
| 10A | 120mEq Potassium Chloride, RED |
| 11A | 60mL Heparin/Saline, BLACK |

**SET 2 BACKUP / SET 3 BACKUP**

| Syringe No. | Label | Syringe No. | Label |
|---|---|---|---|
| 1B | 1.25gm Sodium Pentothal/or Pentobarbital, GREEN | 1C | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 2B | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN | 2C | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 3B | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN | 3C | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 4B | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN | 4C | 1.25 gm Sodium Pentothal/or Pentobarbital, GREEN |
| 5B | 60mL Heparin/Saline, BLACK | 5C | 60mL Heparin/Saline, BLACK |
| 6B | 60mg Pancuronium Bromide, BLUE | 6C | 60mg Pancuronium Bromide, BLUE |
| 7B | 60mg Pancuronium Bromide, BLUE | 7C | 60mg Pancuronium Bromide, BLUE |
| 8B | 60mL Heparin/Saline, BLACK | 8C | 60mL Heparin/Saline, BLACK |
| 9B | 120mEq Potassium Chloride, RED | 9C | 120mEq Potassium Chloride, RED |
| 10B | 120mEq Potassium Chloride, RED | 10C | 120 mEq Potassium Chloride, RED |
| 11B | 60mL Heparin/Saline, BLACK | 11C | 60mL Heparin/Saline, BLACK |

EFFECTIVE: JUNE 10, 2011

ATTACHMENT F
DEPARTMENT ORDER 710
Page 4 of 9

4. Syringes 1A, 2A, 3A, 4A, 1B, 2B, 3B, 4B, 1C, 2C, 3C and 4C each contain 1.25 gm/50 ml. of Sodium Pentothal/or Pentobarbital 1 in 50 ml. of sterile water in four 60 ml. syringes for a total dose of 5 grams of Sodium Pentothal/or Pentobarbital in each set. Each syringe containing Sodium Pentothal/or Pentobarbital shall have a GREEN label which contains the name of the chemical, chemical amount and the designated syringe number.

5. Syringes 5A, 8A, 11A, 5B, 8B, 11B, 5C, 8C AND 11C each contain 60 ml. of a Heparin/Saline solution, at a concentration of 10 units of Heparin per milliliter, and shall have a BLACK label which contains the name of the chemical, chemical amount and the designated syringe number.

6. Syringes 6A, 7A, 6B, 7B, 6C and 7C each contain 60 mg of Pancuronium Bromide for a total of 120 mg of Pancuronium Bromide. Each syringe containing Pancuronium Bromide shall have a BLUE label which contains the name of the chemical, chemical amount and the designated syringe number.

7. Syringes 9A, 10A, 9B, 10B, 9C and 10C each contain 120 milliequivalents of Potassium Chloride for a total of 240 milliequivalents of Potassium Chloride per set. Each syringe containing Potassium Chloride shall have a RED label which contains the name of the chemical, chemical amount and the designated syringe number.

8. After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the Chemical Chart, the Medical Team Leader shall attach two complete sets of the prepared and labeled syringes to the 3-Gang, 3-Way Manifold in the order in which the chemical are to be administered. The syringes will be attached to the 3-Gang, 3-Way Manifold in a manner to ensure there is no crowding, with each syringe resting in its corresponding place in the shadow box which is labeled with the name of the chemical, color, chemical amount and the designated syringe number.

9. The syringes shall be affixed in such a manner to ensure the syringe labels are clearly visible. Prior to attaching the syringes to the 3-Gang, 3-Way Manifold, the flow of each gauge on the manifold shall be checked by the Medical Team Leader running the Heparin/Saline solution through the line to confirm there is no obstruction.

10. After all syringes are prepared and affixed to the 3-Gang, 3-Way Manifold in proper order, the Special Operations Team Leader shall confirm that all syringes are properly labeled and attached to the manifold in the order in which the chemicals are to be administered as designated by the Chemical Chart. Each chemical shall be administered in the predetermined order in which the syringes are affixed to the manifold.

11. The quantities of chemicals prepared and administered may not be changed in any manner without prior approval of the Director.

12. All prepared chemicals shall be utilized or properly disposed of no later than 24 hours after the time designated for the execution to occur. Another three complete sets of syringes shall be prepared and labeled as set forth in the Chemical Chart, should a stay result in delaying the execution beyond the time frame ordered in the Warrant of Execution.

13. The chemical amounts as set forth in the Chemical Chart are designated for the execution of persons weighing 500 pounds or less. The chemical amounts will be reviewed and may be revised as necessary for an inmate exceeding this body weight.

14. The Special Operations Team Recorder is responsible for completing the Sequence of Chemicals, Form 710-9. The Recorder shall document on the form the amount of each chemical administered and confirm that it was administered in the order set forth in the Chemical Chart. Any deviation from the written procedure shall be noted and explained on the form.

ATTACHMENT F
DEPARTMENT ORDER 710
Page 5 of 9

15.  There shall be sufficient lighting and physical space in the chemical room and the execution chamber to enable team members to function properly and to observe the inmate. The lights in the Chemical Room shall not be dimmed in any manner and the window in the Chemical Room shall not have blinds or other covering that may obstruct the Medical and Special Operations Teams ability to observe the inmate.

F.  Movement and Monitoring of Inmate

1.  Prior to moving the inmate from the holding cell to the execution table, the Director will confer with the Attorney General or designee and the Governor or designee to confirm there is no legal impediment to proceeding with the lawful execution and there are no motions pending before a court which may stay further proceedings

2.  The inmate may be offered a mild sedative based on the inmate's need. The sedative shall be provided to the inmate no later than four hours prior to the execution, unless it is determined medically necessary.

3.  At the designated time, the inmate will be brought into the execution room and secured on the table by the prescribed means with the inmate's arms positioned at an angle away from the inmate's side.

4.  The inmate will be positioned to enable the Medical Team and Special Operations Team Leader to directly observe the inmate, the inmate's arms (or other designated IV location) and to monitor the inmate's face with the aid of a high resolution color NTSC CCD camera with 10x Optical zoom lens with pan tilt capability and a 19-inch high resolution and color monitor.

5.  After the inmate has been secured to the execution table, the Restraint Team Leader shall personally check the restraints which secure the inmate to the table to ensure they are not so restrictive as to impede the inmate's circulation, yet sufficient to prevent the inmate from manipulating the catheter and IV lines.

6.  A microphone will be affixed to the inmate's shirt to enable the Medical Team, Special Operations Team Leader and interpreter, if one is utilized, to verbally communicate directly with the inmate and hear any utterances or noises made by the inmate throughout the procedure. The Special Operations Team Leader will confirm the microphone is functioning properly, and that the inmate can clearly hear from their affixed position and be heard in the chemical room.

7.  The Division Director for Offender Operations shall ensure there is a person present throughout the execution who is able to communicate with the inmate in the inmate's primary language. This person will be positioned to clearly see, hear and speak to the inmate throughout the execution.

8.  The Medical Team Leader will attach the leads from the electrocardiograph to the inmate's chest once the inmate is secured and shall confirm that the electrocardiograph is functioning properly and that the proper graph paper is used. A backup electrocardiograph shall be on site and readily available if necessary. Prior to the day of and on the day of the execution both electrocardiograph instruments shall be checked to confirm they are functioning properly.

9.  A Medical Team member shall be assigned to monitor the EKG, and mark the EKG graph paper at the commencement and completion of the administration of each chemical. The assigned identifier of the Medical Team member monitoring the electrocardiograph shall be noted at each juncture.

10.  Throughout the procedure, the Medical Team members shall continually monitor the inmate's level of consciousness and electrocardiograph readings, maintaining constant observation of the inmate utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the Medical Team Leader. The Medical Team Leader shall be responsible for monitoring the inmate's level of consciousness.

ATTACHMENT F
DEPARTMENT ORDER 710
Page 6 of 9

G. Intravenous Lines

1.  The IV Team members shall determine site and insert a primary IV catheter and a backup IV catheter in two separate locations in the peripheral veins utilizing appropriate medical procedures. The insertion sites in order of preference shall be: arms, hands, ankles and feet, as determined medically appropriate by the Medical Team Leader. Both primary and backup IV lines will be placed unless in the opinion of the Medical Team Leader it is not possible to reliably place two peripheral lines.

2.  To ensure proper insertion in the vein, the IV Team should watch for the dark red flashback of blood at the catheter hub in compliance with medical procedures.

3.  The IV Team members shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the inmate's hands. A flow of Heparin/Saline shall be started in each line and administered at a slow rate to keep the line open.

4.  The primary IV catheter will be used to administer the chemicals and the backup catheter will be reserved in the event of the failure of the first line. Any failure of a venous access line shall be immediately reported to the Director.

5.  The IV Catheter in use shall not be covered and shall remain visible throughout the procedure. The IV catheter in use shall remain visible to a staff member throughout the procedure.

6.  The warden shall physically remain in the room with the inmate throughout the administration of the chemicals in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems and shall immediately notify the Medical Team Leader and Director should any issue occur. Upon receipt of such notification, the Director will stop the proceedings and take all steps necessary in consultation with the Medical Team Leader prior to proceeding further with the execution.

7.  Should the use of the backup IV catheter be determined to be necessary, a complete set of backup chemicals should be administered in the backup IV as set forth in the chemical chart.

8.  Should it become necessary to use an alternate means of establishing an IV line because, in the opinion of the Medical Team Leader, it is not possible to reliably place a peripheral line in the inmate, a Medical Team member may utilize a percutaneous central line in the inmate's femoral vein in the thigh if, in the opinion of a qualified Medical Team member, such a line may be reasonably placed. The Medical Team member responsible for placing a percutaneous central line in the inmate's femoral vein shall have at least one year of regular and current professional experience conducting that procedure. The Medical Team member will place the percutaneous central line catheter in the inmate's femoral vein utilizing appropriate medical procedures which includes the use of an ultrasound to assist in properly inserting the catheter and anesthetic such as Lidocaine. The Medical Team member shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the inmate's hands. This line shall be utilized for the administering of all chemicals.

9.  Upon successful insertion of the catheter into the inmate's femoral vein, a Medical Team member will inject a solution of Heparin and Saline into the catheter to ensure patency of the catheter.

H. Administration of Chemicals

1.  At the time the execution is to commence and prior to administering the chemicals, the Director will reconfirm with the Attorney General or designee and the Governor or designee that there is no legal impediment to proceeding with the execution. Upon receipt of oral confirmation that there is no legal impediment, the Director will order the administration of the chemicals to begin.

ATTACHMENT F
DEPARTMENT ORDER 710
Page 7 of 9

2. Upon receipt of the Director's order and under observation of the Medical Team Leader, the Special Operations Team Leader will instruct the assigned Special Operations Team member to begin dispensing the first chemical.

3. Upon direction from the Special Operations Team Leader, the assigned Special Operations Team member will visually and orally confirm the chemical name on the syringe and then administer the full dose of Sodium Pentothal/or Pentobarbital immediately followed by the Heparin/Saline flush. The Heparin/Saline is administered as a secondary precaution to further ensure the line is functioning properly and flushed between each chemical.

4. After the Sodium Pentothal/or Pentobarbital and Heparin/Saline have been administered and before the Special Operations Team members begin administering the Pancuronium Bromide, the Medical Team shall confirm the inmate is unconscious by sight and sound utilizing the audio equipment, camera and monitor.

5. The Medical Team Leader, dressed in a manner to preserve their anonymity, will enter into the room where the warden and inmate are located to physically confirm the inmate is unconscious by using all necessary medically appropriate methods. The Medical Team Leader will also confirm that the IV line remains affixed and functioning properly.

6. No further chemicals shall be administered until the Medical Team Leader has confirmed the inmate is unconscious, has verbally advised the Director and three minutes have elapsed since commencing the administration of the Sodium Pentothal/or Pentobarbital.

7. In the unlikely event that the inmate is conscious, the Medical Team shall assess the situation to determine why the inmate is conscious. The Medical Team Leader shall communicate this information to the Director, along with all Medical Team input. The Director will determine how to proceed or, if necessary, to start the procedure over at a later time or stand down. The Director may direct the curtains to the witness viewing room be closed, and, if necessary, for witnesses to be removed from the facility.

8. If deemed appropriate, the Director may instruct the Special Operations Team to administer an additional 5 gm of Sodium Pentothal/or Pentobarbital followed by the Heparin/Saline flush from Backup Set 1.

9. Upon administering the Sodium Pentothal/or Pentobarbital and Heparin/Saline from Backup Set 1, the Medical Team shall confirm the inmate is unconscious by sight and sound, utilizing the audio equipment, camera and monitor. The Medical Team Leader will again physically confirm the inmate is unconscious using proper medical procedures and verbally advise the Director of the same.

10. Only after receiving oral confirmation from the Medical Team Leader that the inmate is unconscious and three minutes have elapsed since commencing the administration of the Sodium Pentothal/or Pentobarbital and Heparin/Saline from Backup Set 1, will the Director instruct the Special Operations Team Leader to proceed with administering the next chemicals.

11. When instructed, the Special Operations Team Leader will instruct the assigned Special Operations Team members to begin administering the full doses of the remaining chemicals (Pancuronium Bromide and Potassium Chloride), each followed by a Heparin/Saline flush as set forth in the Chemical Chart.

12. If after administering the Potassium Chloride and subsequent Heparin/Saline flush, the electrical activity of the inmate's heart has not ceased, the additional potassium chloride and Heparin/Saline flush contained in Backup Set 1 shall be administered.

13. When all electrical activity of the heart has ceased as shown by the electrocardiograph, the Medical Team Leader, following standard medical procedures, will confirm the inmate is deceased and the inmate's death shall be announced by the Director.

EFFECTIVE: JUNE 10, 2011

ATTACHMENT F
DEPARTMENT ORDER 710
Page 8 of 9

14. If all electrical activity of the heart ceases prior to administering all the chemicals, the team members shall continue to follow this protocol and administer all remaining chemicals in the order and amounts set forth in the Chemical Chart.

15. The full dose contained in each syringe shall be administered to the inmate and subsequently documented by the designated recorder. The quantities of the chemicals prepared and administered may not be changed in any manner without prior approval of the Director after consultation with the Medical Team Leader.

16. Throughout the entire procedure, the Medical Team members, the Special Operations Team members and the Warden shall continually monitor the inmate using all available means to ensure that the inmate remains unconscious and that there are no complications.

I. Post Execution Procedures

1. Upon the pronouncement of death, the Director shall notify the Governor or designee via the open phone line that the sentence has been carried out and the time that death occurred. The Director will advise the Attorney General, Board of Executive Clemency and Arizona Supreme Court telephonically.

2. A Medical Team member will clamp and cut the IV line leaving it connected to the inmate for examination by the Pinal County Medical Examiner or designee.

3. A Criminal Investigations Unit investigator and the Pinal County Medical Examiner or designee will take photos of the inmate's body:
   • While in restraints prior to being placed in the body bag,
   • Without restrains prior to being placed in the body bag,
   • Sealed in the body bag, and
   • A photo of the seal in place on the bag.

4. The inmate's body will be placed on a Pinal County Medical Examiner's gurney and released into the custody of the Pinal County Medical Examiner's Office.

5. Once the inmate's body is placed in the Pinal County Medical Examiner's transport vehicle, it will be escorted off the premises. The Examiner's Office will take the inmate's body to the medical examiner's office designated by the county.

J. Documentation of Chemicals and Stay

1. In the event that a pending stay results in more than a two hour delay, the inmate shall be returned to the holding cell until further notice and the catheter removed, if applicable.

2. Upon completion of the execution or when a stay exceeding 24 hours is granted, the Special Operations Team Leader shall properly dispose of all unused chemicals according to applicable state and federal law in the presence of the Special Operations Team Recorder.

3. The Special Operations Team Recorder shall observe the disposal of all chemicals that were not administered and document in the *Sequence of Chemicals* form the chemical name, syringe number, amount disposed, date disposed and the time. The Special Operations Team Leader and the Recorder each will sign the Sequence of Chemicals form with their identifiers.

4. All logs, the *Sequence of Chemicals* form, the list of identifiers and the EKG tape shall be submitted to the Department's General Counsel for review and storage.

EFFECTIVE: JUNE 10, 2011

ATTACHMENT F
DEPARTMENT ORDER 710
Page 9 of 9

K. Contingency Procedure

1. An Automated External Defibulator (AED) will be readily available on site in the event that the inmate goes into cardiac arrest at any time prior to dispensing the chemicals; trained medical staff shall make every effort to revive the inmate should this occur. .

2. Trained medical personnel and emergency transportation, neither of which is involved in the execution process, shall be available in proximity to respond to the inmate should any medical emergency arise at any time before the order to proceed with the execution is issued by the Director.

3. If at any point any team member determines that any part of the execution process is not going according to procedure, they shall advise the Medical Team Leader who shall immediately notify the Director. The Director may consult with persons deemed appropriate and. will determine to go forward with the procedure, start the procedure over at a later time within the 24-hour day, or stand down.

4. There shall be no deviation from the procedures as set forth herein, without prior consent from the Director.

L. Debrief and Policy Review

1. The Medical and Special Operations Teams will participate in a debriefing immediately upon completion of the event. The Division Director for Offender Operations shall ensure that each team member is also contacted at a later date for follow up and comment. All input will be considered and, if appropriate, procedures may be modified.

2. The procedures outlined herein shall be reviewed during each execution rehearsal and after each execution by the Medical Team Members and the Special Operations Team Members.

3. The procedures outlined herein shall also be independently reviewed by the Department's Quality Assurance Committee at the issuance of a Warrant of Execution, after every execution and annually.