PER CURIAM.
 

 Manuel Valle, a prisoner under sentence of death, appeals the denial of his amended successive motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. On June 30, 2011, the Governor signed a death warrant for Valle, and he was scheduled to be executed on August 2, 2011. Valle subsequently sought postconviction relief in the circuit court, raising numerous claims, including an Eighth Amendment challenge to the Florida Department of Correction’s (DOC) June 8, 2011, lethal injection protocol, which replaced the first drug in its three-drug sequence, sodium thiopental, with another drug, pentobarbital sodium (pentobarbital). Under this claim, Valle primarily argued that due to “serious concerns” regarding the efficacy of pentobar-bital to render an inmate unconscious, the DOC’s use of that drug in the protocol constitutes cruel and unusual punishment. After the circuit court summarily denied relief on his claims, this Court granted Valle’s motion for a stay of execution, in part, until September 1, 2011, and temporarily relinquished jurisdiction for the narrow purpose of holding an evidentiary hearing on Valle’s claim regarding the efficacy of pentobarbital as an anesthetic in the amount prescribed by Florida’s protocol. Following an evidentiary hearing, the circuit court again denied relief. For the reasons set forth below, we now affirm the circuit court’s orders and vacate the temporary stay of execution.
 

 FACTS AND PROCEDURAL HISTORY
 

 In 1978, Valle was charged with the first-degree murder of police officer Louis Pena, the attempted first-degree murder of police officer Gary Spell, and possession of a firearm by a convicted felon arising from an April 2, 1978, shooting in Coral Gables, Florida. Since the date of the crime, Valle’s case has had a complex pro
 
 *535
 
 cedural history.
 
 [1]
 
 Despite this history, the facts of Valle’s case have never been disputed and were set forth in
 
 Valle v. State (Valle IV),
 
 581 So.2d 40 (Fla.1991), following the appeal from his third and final penalty phase:
 

 On April 2, 1978, Officer Louis Pena of the Coral Gables Police Department was on patrol when he stopped [Valle] and a companion for a traffic violation. The events that followed were witnessed by Officer Gary Spell, also of the Coral Gables Police Department. Officer Spell testified that when he arrived at the scene, [Valle] was sitting in the patrol car with Officer Pena. Shortly thereafter, Spell heard Pena use his radio to run a license check on the car [Valle] was driving. According to Spell, [Valle] then walked back to his car and reached into it, approached Officer Pena and fired a single shot at him, which resulted in his death. [Valle] also fired two shots at Spell and then fled. He was picked up two days later in Deerfield Beach. Following his jury trial, [Valle was found guilty of the first-degree murder of Pena. He] was also found guilty of the attempted first-degree murder of Spell and after a non-jury trial, he was found guilty of possession of a firearm by a convicted felon.
 

 Id.
 
 at 43 (quoting
 
 Valle II,
 
 474 So.2d at 798). This Court affirmed Valle’s convictions in 1985.
 
 Valle II,
 
 474 So.2d at 806.
 
 [2]
 

 In 1988, Valle was resentenced. The jury recommended a sentence of death by a vote of eight to four.
 
 Valle IV,
 
 581 So.2d at 43. The sentencing court found that the evidence established the following aggravating circumstances: (1) Valle had been previously convicted of another violent felony; (2) the murder was of a law enforcement officer; (3) the murder was for the purpose of preventing lawful arrest; (4) the murder was committed to hinder the enforcement of laws; and (5) the murder was cold, calculated, and premeditated.
 
 Id.
 
 The sentencing court merged factors (2), (3), and (4) together, treating them as a single aggravating factor.
 
 Id.
 
 The court found no evidence of statutory mitigation and concluded that either the evidence did not establish nonstatutory mitigation or the nonstatutory mitigation was outweighed by the aggravating factors.
 
 Valle V,
 
 705 So.2d at 1333 n. 1. This Court affirmed Valle’s sentence of death in 1991.
 
 Valle IV,
 
 581 So.2d at 49.
 

 In December 1993, Valle filed an amended motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The circuit court summarily denied the motion without holding an evidentiary
 
 *536
 
 hearing, and Valle appealed.
 
 Valle V,
 
 705 So.2d at 1333. This Court affirmed in part, but reversed and remanded for an evidentiary hearing on two of Valle’s ineffective assistance of counsel claims.
 
 Id.
 
 at 1333-34.
 
 [3]
 
 After conducting the requisite evidentiary hearing on remand, the circuit court denied Valle’s remaining rule 3.850 claims, and this Court affirmed.
 
 Valle v. State (Valle VI),
 
 778 So.2d 960, 964, 967 (Fla.2001).
 

 In December 2001, Valle petitioned this Court for a writ of habeas corpus based on the alleged ineffective assistance of appellate counsel. This Court denied the petition.
 
 See Valle v. Moore (Valle VII),
 
 837 So.2d 905 (Fla.2002). In February 2003, Valle filed a successive habeas petition in this Court, raising a claim under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which this Court summarily denied.
 
 See Valle v. Crosby,
 
 859 So.2d 516 (Fla.2003) (unpublished table decision). He petitioned to the United State Supreme Court for a writ of certiorari, which was also denied.
 
 See Valle v. Crosby,
 
 541 U.S. 962, 124 S.Ct. 1720, 158 L.Ed.2d 405 (2004).
 

 Valle later filed an amended federal ha-beas petition, raising claims previously addressed by this Court.
 
 See Valle v. Crosby (Valle VIII),
 
 No. 03-20387CIV, 2005 WL 3273754 (S.D.Fla. Sept. 13, 2005). The federal district court denied his petition, and the United States Court of Appeals for the Eleventh Circuit affirmed.
 
 See Valle v. Sec’y for the Dep’t of Corr. (Valle IX),
 
 459 F.3d 1206 (11th Cir.2006),
 
 reh’g en banc denied,
 
 478 F.3d 1326 (11th Cir.2007). Thereafter, Valle sought review of the Eleventh Circuit’s affirmance by the Supreme Court through a petition for writ of certiorari, which was denied on October 1, 2007.
 
 See Valle v. McDonough,
 
 552 U.S. 920, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007).
 

 On June 30, 2011, Governor Rick Scott signed a death warrant, and Valle’s execution was set for August 2, 2011. Twenty-two days prior, on June 8, 2011, the DOC had promulgated a revised lethal injection procedure, replacing the first drug in its three-drug protocol, sodium thiopental, with another barbiturate, pentobarbital.
 
 [4]
 
 The DOC’s recent substitution of the drug comes more than three years after this Court upheld the August 2007 three-drug protocol against a constitutional challenge in
 
 Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007), and after a majority of the United States Supreme Court upheld the constitutionality of a similar protocol in
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).
 
 [5]
 
 The parties agree that aside from substituting pento-barbital for sodium thiopental, the DOC’s lethal injection protocol has remained unaltered.
 

 In response to the signing of the death warrant, Valle filed a successive amended motion for postconviction relief, raising six claims.
 
 [6]
 
 Among other issues, he argued
 
 *537
 
 that due to “serious concerns” regarding the efficacy of pentobarbital to render an inmate unconscious, the DOC’s use of that drug in the protocol constitutes cruel and unusual punishment in contravention of the Eighth Amendment. After the State filed its response, the circuit court held an initial hearing pursuant to Florida Rule of Criminal Procedure 3.851(h)(6) on July 11, 2011, to determine whether an evidentiary hearing would be held. At the conclusion of the hearing, the circuit court summarily denied all of Valle’s claims, and Valle appealed the summary denial to this Court.
 
 [7]
 
 A majority of the Court determined that Valle’s claim as to the use of pentobarbital as an anesthetic in the amount prescribed by Florida’s protocol warranted an eviden-tiary hearing. Chief Justice Canady dissented, with whom Justices Lewis and Pol-ston joined. This Court therefore granted a stay of execution until September 1, 2011, and temporarily relinquished jurisdiction for the purpose of holding an evi-dentiary hearing on that discrete issue alone. The Court also directed the DOC to produce correspondence and documents it had received from the manufacturer of pentobarbital, Lundbeck, Inc., concerning the drug’s use in executions, including those materials addressing any safety and efficacy issues.
 

 Pursuant to this Court’s order, the circuit court conducted an evidentiary hearing on July 28 and August 2, 2011, during which Valle presented the testimony of Dr. David Waisel, an anesthesiologist, and federal public defender Matt Schulz, who witnessed the June 16, 2011, execution of his client, Eddie Powell, in Alabama. Valle also offered into evidence several letters, which were written by Lundbeck to the DOC and Governor Scott regarding the company’s opposition to the use of its drug in executions. In rebuttal, the State presented the testimony of Dr. Mark Der-shwitz, an anesthesiologist, and John Harper and Dr. Jacqueline Martin, both of whom witnessed the June 23, 2011, execution of Roy Blankenship in Georgia.
 

 
 *538
 
 Following the presentation of this evidence, the circuit court entered its order denying Valle’s claim that the substitution of pentobarbital as an anesthetic violated the Eighth Amendment. Jurisdiction has since returned to this Court, and we now consider all pending issues on appeal.
 
 [8]
 

 ANALYSIS
 

 Constitutionality of Florida’s Lethal Injection Procedures
 

 In this claim, Valle raises various challenges to the constitutionality of Florida’s lethal injection procedures, but the bulk of his argument focuses on the DOC’s June 8, 2011, substitution of five grams of pento-barbital for five grams of sodium thiopen-tal as the first of three drugs used in the lethal injection protocol. In Florida, the first drug is used to anesthetize the condemned inmate prior to the administration of the final two drugs in the three-drug sequence, pancuronium bromide (a paralytic agent that can stop respiration) and potassium chloride (a substance that will cause the heart to stop). Valle acknowledges that aside from substituting pento-barbital for sodium thiopental, both of which are barbiturates, Florida’s lethal injection protocol has remained unaltered since this Court’s decision in
 
 Lightboume,
 
 which upheld the August 2007 lethal injection protocol against a similar constitutional challenge. He therefore argues that the DOC’s plan to use pentobarbital constitutes cruel and unusual punishment because as a result of the substitution, he may remain conscious after being injected with pentobarbital, thereby subjecting him to significant pain during the administration of the final two drugs. As presented, the DOC’s recent replacement of sodium thiopental with pentobarbital in Florida’s three-drug lethal injection sequence is the primary claim underlying Valle’s Eighth Amendment challenge.
 

 Pursuant to this Court’s order of relinquishment, the circuit court conducted a two-day evidentiary hearing, which included the admission of expert testimony from both parties, letters authored by Lund-beck, and eyewitness testimony from individuals who were present during the executions of Alabama inmate Eddie Powell and Georgia inmate Roy Blankenship. After receiving this evidence, the circuit court denied relief, concluding that the substitution of pentobarbital as an anesthetic did not violate the Eighth Amendment because the evidence failed to establish that the intravenous administration of pentobarbital creates a substantial risk of serious harm. After a thorough review of the record, we affirm the circuit court’s denial.
 

 This Court has previously recognized its duty “to ensure that the method used to execute a person in Florida does not constitute cruel and unusual punishment.” Ligh
 
 tbourne,
 
 969 So.2d at 349. To fulfill its obligation, this Court is guided by article I, section 17 of the Florida Constitution, which provides that “[a]ny meth od of execution shall be allowed, unless prohibited by the United States Constitution.” Specifically, Florida’s provision on the prohibition against cruel and unusual punishment “shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution.” Art. I, § 17, Fla. Const. Therefore, in accordance with our state constitution, this Court is bound by the precedent of the Supreme Court regarding challenges to
 
 *539
 
 this state’s chosen method of execution.
 
 See Lightbourne,
 
 969 So.2d at 335 (“[W]e must evaluate whether lethal injection is unconstitutional ‘in conformity with decisions of the United States Supreme Court.’ ” (quoting art. 1, § 17, Fla. Const.)).
 

 The parties agree that Valle’s various challenges to the DOC’s lethal injection procedures are governed by the Supreme Court’s plurality decision in
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), which defined the contours of a condemned inmate’s burden of proof for mounting a successful Eighth Amendment challenge to a state’s lethal injection protocol.
 
 [9]
 
 Although acknowledging that “subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment,” the Supreme Court in
 
 Baze
 
 explained that to prevail on such a claim, condemned inmates must demonstrate that “the conditions presenting the risk must be
 
 ‘sure or very likely
 
 to cause serious illness and needless suffering,’ and give rise to ‘sufficiently
 
 imminent
 
 dangers.’ ” 553 U.S. at 49-50, 128 S.Ct. 1520 (quoting
 
 Helling v. McKinney,
 
 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)) (plurality opinion);
 
 see also Brewer v. Landrigan,
 
 — U.S.-, 131 S.Ct. 445, 445, 178 L.Ed.2d 346 (2010) (“[Sjpeculation cannot substitute for evidence that the use of the drug is
 
 ‘sure or very likely
 
 to cause serious illness and needless suffering.’” (quoting
 
 Baze,
 
 553 U.S. at 50, 128 S.Ct. 1520)). That is, “there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm’ that prevents prison officials from pleading that they were ‘subjectively blameless for purposes of the Eighth Amendment.’ ”
 
 Baze,
 
 553 U.S. at 50, 128 S.Ct. 1520 (quoting
 
 Farmer v. Brennan,
 
 511 U.S. 825, 842, 846 & n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This standard imposes a “heavy burden” upon the inmate to show that lethal injection procedures violate the Eighth Amendment.
 
 Id.
 
 at 53, 128 S.Ct. 1520 (quoting
 
 Gregg v. Georgia,
 
 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).
 

 Cognizant of this standard, we now turn to Valle’s challenge to the DOC’s substitution of pentobarbital for sodium thiopental. In the lethal injection context, “the condemned inmate’s lack of consciousness is the focus of the constitutional inquiry.”
 
 Ventura,
 
 2 So.3d at 200;
 
 see also Schwab,
 
 995 So.2d at 924, 927 (adopting the trial court’s order, which stated that “the critical Eighth Amendment concern is whether the prisoner has, in fact, been rendered unconscious by the first drug”). As we explained in
 
 Lightboume,
 
 “[i]f the inmate is not fully unconscious when either pancuronium bromide or potassium chloride [the second and third drugs in the protocol] is injected, or when either of the chemicals begins to take effect, the prisoner will suffer pain.” 969 So.2d at 351;
 
 see also Baze,
 
 553 U.S. at 53, 128 S.Ct. 1520
 
 *540
 
 (“[Fjailing a proper dose of sodium thio-pental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride.”).
 

 In order to show the risks of using pentobarbital as a substitute, Valle relies extensively on the testimony of Dr. Waisel, who testified that pentobarbital and sodium thiopental are not interchangeable barbiturates, that five grams of sodium thio-pental are not proportionally equivalent to five grams of pentobarbital, and that due to a lack of research, he would be unable to determine a dose of pentobarbital that would properly anesthetize an individual. Instead, he could only testify as to the amount needed to sedate someone. According to Dr. Waisel, a sedated patient may still be responsive while an anesthetized patient may be unconscious enough to undergo an open-chest surgery. In his opinion, the allowable upper dose needed to sedate a person would fall between 200 and 500 milligrams of pentobarbital, but he acknowledged that the amount used by the DOC for anesthetizing an inmate is 5000 milligrams. Although Dr. Waisel identified the use of pentobarbital to induce anesthesia as “off label,” since the drug’s package insert
 
 [10]
 
 does not mention induction of anesthesia as an indication, he testified that there are legitimate “off-label” uses for drugs. In fact, Dr. Waisel agreed that pentobarbital is used as part of physician-assisted suicide and animal euthanasia procedures. In sum, Dr. Waisel opined that because there is insufficient data regarding the use of pentobarbital as an anesthetic, there would be no way to know, in any given case, how an overdose of the drug will affect healthy inmates.
 

 In opposition, the State presented the testimony of Dr. Dershwitz, who testified that 5000 milligrams of pentobarbital, as provided for in the DOC’s lethal injection protocol, is “far in excess of the dose that would be used in a human for any reason.” According to Dr. Dershwitz, that dosage of pentobarbital is lethal standing alone, and when administered, the drug will induce a total flat line on the electroencephalogram (EEG) in brain activity, meaning that the person into whom the drug is injected will have no perception or sensation. Although Dr. Dershwitz acknowledged that the FDA had not approved pentobarbital for use in lethal injections, like Dr. Waisel, he explained that its use for such purposes was considered “off label” and that using a drug in an “off-label” manner is “common in medicine.”
 

 In reviewing this portion of Valle’s claim, the circuit court credited the testimony of Dr. Dershwitz over that of Dr. Waisel, specifically finding Dr. Der-shwitz’s testimony to be “credible and persuasive” and Dr. Waisel’s testimony to be “based on speculation” and “therefore, inherently unreliable.” As we have previously explained, where “the trial court’s findings are supported by competent substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.”
 
 Provenzano v. State,
 
 761 So.2d 1097, 1099 (Fla.2000) (quoting
 
 Blanco v. State,
 
 702 So.2d 1250, 1252 (Fla.1997));
 
 see id.
 
 at 1098-99 (applying competent, substantial evidence standard to re
 
 *541
 
 view Provenzano’s Eighth Amendment challenge to Florida’s lethal injection procedure following an evidentiary hearing on the issue). In applying this standard, “[w]e recognize and honor the trial court’s superior vantage point in assessing the credibility of witnesses and in making findings of fact.”
 
 Porter v. State,
 
 788 So.2d 917, 923 (Fla.2001). This stems from our recognition that “the trial court is in the best position to evaluate the credibility of witnesses, and appellate courts are obligated to give great deference to the findings of the trial court.”
 
 Durousseau v. State,
 
 55 So.3d 543, 562 (Fla.2010),
 
 petition for cert. filed,
 
 No. 10-10518 (U.S. May 10, 2011).
 

 Based upon the testimony presented, the circuit court concluded that Dr. Dershwitz “refuted any suggestion that the dose of pentobarbital in the Florida lethal injection protocol would leave an inmate conscious and able to experience pain and suffering during the lethal injection process.”
 
 [11]
 
 The circuit court’s findings are borne out by the testimony and are well-supported by the record. While Dr. Waisel opined that he would be unable to determine whether pentobarbital would produce its intended effect (i.e., to anesthetize the inmate before the administration of the last two drugs in the three-drug sequence), in the end, he did not testify that the drug would fail to do so. By asserting that no evidence exists concerning whether pentobarbital will render an inmate unconscious, Valle has failed to meet his burden of proof.
 
 [12]
 
 As the circuit court correctly recognized, Dr. Waisel’s asserted lack of knowledge about pentobarbi-tal’s effects falls short of the heavy burden of affirmatively showing that the drug is sure or very likely to cause serious illness and needless suffering or that its use will result in a substantial risk of serious harm.
 
 See DeYoung v. Owens,
 
 646 F.3d 1319, 1326 n. 4 (11th Cir.2011) (“DeYoung also alleges that pentobarbital has not been sufficiently tested for its ability to cause an anesthetic coma in fully conscious persons. However, DeYoung’s expert candidly admits he does not know how the State’s dosage of pentobarbital will affect inmates because he claims there is no way to know. This asserted
 
 lack
 
 of knowledge obviously cannot satisfy DeYoung’s burden of affirmatively showing that a substantial risk of serious harm exists.”).
 
 [13]
 

 
 *542
 
 Despite Dr. Dershwitz’s testimony, Valle also relies on a collection of letters sent from Lundbeck, the manufacturer of pentobarbital, to the DOC and the Governor stating that the use of pentobar-bital outside of the approved label has not been established, and that consequently, Lundbeck could not assure the associated safety and efficacy profiles in such instances. These letters further requested that this state stop using pentobarbital to execute prisoners.
 
 [14]
 

 The circuit court concluded that these letters carried no weight and exhibited no legal value because “[t]here was no mention of medical evidence or anything relevant to the court’s inquiry.” We agree. The experts for both Valle and the State recognized that a variety of drugs have acceptable “off-label” uses. Lundbeck’s opposition to the use of pentobarbital and asserted lack of information as to the drug’s efficacy and safety for use in lethal injections do nothing to establish a substantial risk of serious harm.
 
 See, e.g., West v. Brewer,
 
 No. CV-11-1409-PHX-NVW, 2011 WL 2836754, at *8 (D.Ariz. July 18, 2011) (finding the manufacturer’s “warning” against the use of pentobarbital in executions unpersuasive since it did not establish a substantial risk of harm),
 
 aff'd,
 
 652 F.3d 1060 (9th Cir. 2011);
 
 Powell v. Thomas,
 
 784 F.Supp.2d 1270, 1281 n. 7 (M.D.Ala. 2011) (“Williams emphasizes that the manufacturer of pentobarbital has pronounced that it is opposed to its drug being used for executions, but fails to demonstrate how that fact is in any way relevant to the issues and his burden.”),
 
 aff’d,
 
 641 F.3d 1255 (11th Cir.),
 
 cert.
 
 denied,U.S. -, 131 S.Ct. 2487, 179 L.Ed.2d 1243 (2011).
 

 To further buttress his assertion that the drug’s substitution amounts to an Eighth Amendment violation, Valle points to the recent executions of Alabama inmate Eddie Powell and Georgia inmate Roy Blankenship. Valle contends that Alabama’s and Georgia’s use of pentobar-bital to execute inmates resulted in botched executions or executions that did not go according to plan. With respect to the Powell execution, Valle presented the testimony of Powell’s attorney, Matt Schulz, who was able to observe Powell’s left side, face, and right arm during the execution. As Schulz explained, after the warden permitted Powell to recite his last words, the warden walked behind Powell and made an announcement that the execution was to be carried out; the intravenous (IV) lines ran into a wall, which led to
 
 *543
 
 a room outside the execution chamber. Schulz testified that he could not see the drugs being administered and did not know when the injections began. After the warden left the execution chamber, Schulz explained, a chaplain took Powell’s left hand and spoke to Powell for around thirty seconds to a minute, during which Powell turned to Schulz, “nodded a little bit and then took a deep breath and laid his head back.”
 

 By Schulz’s account, approximately one minute later, Powell suddenly jerked his head up, it appeared as though his upper body was pressing against the restraints, and he looked around with confusion. Schulz asserted that Powell clenched his jaw, flexed his muscles, and his arteries bulged. This episode lasted approximately one minute, and then Powell’s eyes glazed over, rolled back into his head, and then his head rested. As Schulz described it, after a few minutes, a guard approached Powell, yelled his name three times, and then ran his finger over Powell’s left eyelash; Powell did not respond to the guard’s actions. After a couple of minutes, Schulz noticed that Powell’s eyes were slightly opened, although Schulz did not actually see at what point they opened. Schulz also did not see Powell’s eyes close, but remembered that by the end of the procedure, which lasted around twenty to twenty-five minutes, Powell’s eyes were fully closed.
 

 The circuit court rejected Schulz’s testimony as speculative and concluded that “[e]ven if the entire situation lasted one minute, it certainly does not establish that [Powell] suffered to establish an Eighth Amendment claim.” As the circuit court more fully explained:
 

 The only witness testifying about the execution of Powell did not know when the pentobarbital was administered. The relationship between the supposed short term movements reported and the administration of pentobarbital is totally speculative. Nor was Schulz aware of the amount of drugs used in that instance. Schulz stated that the inmate did not move after the consciousness check was done by the prison officials. This same consciousness check is included in the Florida protocol. If after the initial administration of pentobarbital the inmate shows any signs [of] responsiveness, more anesthetic (pentobarbital) is administered. No additional drugs were necessary for Powell, according to the testimony, suggesting that the inmate was unconscious and the pentobar-bital was effective in rendering him unconscious.
 

 We accept the circuit court’s findings as supported by competent, substantial evidence.
 

 As to the Blankenship execution, Valle again relies on the testimony of Dr. Wai-sel, who was not present at the execution but testified that Blankenship “suffered extremely.” After reviewing various materials,
 
 [15]
 
 Dr. Waisel opined that based on reports, Blankenship looked at his arms with discomfort and pain, grimaced, jerked his head up, and continued breathing and mouthing words for up to what was reported to be three minutes. Dr. Waisel explained that Blankenship’s movement should have stopped fifteen seconds after the pentobarbital reached his body, and
 
 *544
 
 given that Blankenship’s body movements lasted for three minutes, the drug did not work as it was intended. Dr. Waisel never opined as to what time the pentobarbital was actually administered.
 

 To rebut Dr. Waisel’s testimony, the State presented the eyewitness testimony of John Harper and Dr. Jacqueline Martin. According to Harper, who works for the Georgia Department of Corrections, Blankenship had an IV line running into each of his arms. Harper observed Blankenship look at his left arm about five seconds after the start of the first syringe, which was injected into Blankenship’s right arm. Harper testified that within ten seconds of the first drug’s administration, Blankenship appeared to be unconscious, and other than Blankenship looking at his left arm and making what he described as a “grunt” sound, he did not observe anything else. Similarly, Dr. Martin stated that two or three minutes after the warden left the execution chamber, Blankenship looked at his left arm, moved his mouth, looked at his right arm, put his head down on a pillow, and then did not move. She observed no obvious signs of distress or facial features indicating pain, and in her medical opinion, Blankenship was not in pain during the execution.
 

 In reviewing the above testimony, the circuit court determined that the State presented two “very credible witnesses” who testified consistently with one another and found that that there was no indication that Blankenship experienced pain or suffering. The court more fully explained:
 

 Of all the witnesses on the issue of the Blankenship execution, Harper [was] the most credible on this topic. He actually could hear and could see the pushing of the syringes and was keeping a time log. His testimony [was] in keeping, ironically, with the acceptable parameters testified to by Dr. Waisel. Waisel stated that if the pentobarbital were to work properly that it would take effect within fifteen (15) seconds. That it did, according to the only witness able to testify with any degree of certainty as to the timing of the administration of the drugs and rendering of unconsciousness.
 

 [[Image here]]
 

 Dr. Martin’s testimony [was] consistent with that of Mr. Harper. She is a medical professional who could see Blankenship’s actions and facial features. Her interpretation of his reactions to the drugs substantiate that Blankenship in no way experienced pain or suffering.
 

 After noting that Dr. Waisel was not present at the execution, but rather relied upon the affidavit of a reporter who was not called to testify, the circuit court further found as follows:
 

 The testimony of the witnesses to Blankenship’s execution differed with regard to the amount and nature of the movement by Blankenship. No one could testify conclusively about the relationship between the reported movement and the administration of pento-barbital with the exception of the state’s witness, John Harper. He reported only minimal movement and within seconds of the pushing of the syringe. There is no indication that the inmate was in any discomfort much less pain or suffering; only that he glanced at his arm and gave a grunt. Within ten (10) seconds the inmate was unconscious, according to Harper, who was not only in a more advantageous place to see and note what was taking place. He also kept a time log.
 

 To the extent that the witnesses differed in their testimony, this court resolves credibility issues in favor of Mr. Harper who is accustomed to watching
 
 *545
 
 executions and thus, has a more objective view. He testified quite credibly and persuasively. Further, there was no movement of the inmate reported by any witnesses after the prison official’s consciousness check.
 

 The circuit court’s resolution of this issue is supported by competent, substantial evidence.
 

 Valle attempts to use the Powell and Blankenship executions to show that the administration of pentobarbital does not adequately render an inmate unconscious. However, the record before this Court supports the circuit court’s findings to the contrary. Nevertheless, even if we were to assume that problems arose during the course of the Blankenship and Powell executions, the United States Supreme Court has advised that “an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a ‘substantial risk of serious harm.’ ”
 
 Baze,
 
 553 U.S. at 50, 128 S.Ct. 1520 (quoting
 
 Farmer,
 
 511 U.S. at 842, 114 S.Ct. 1970). Thus, Valle has failed to satisfy the
 
 Baze
 
 standard, which requires proof that the replacement of the drug is
 
 “sure or very likely
 
 to cause serious illness and needless suffering.”
 
 Id.
 
 (quoting
 
 Helling,
 
 509 U.S. at 34, 113 S.Ct. 2475).
 

 Valle does not, however, premise his Eighth Amendment claim solely on the DOC’s recent substitution of pentobarbital for sodium thiopental. Rather, Valle contends that the substitution of the drug,
 
 coupled
 
 with inadequate procedural safeguards and a cavalier attitude toward lethal injection, puts him at risk of serious harm. Specifically, Valle notes the existence of various inadequacies in Florida’s lethal injection procedures, including how the drugs are administered and the manner in which consciousness is assessed and monitored. Referring to what he describes as Florida’s unique history of deviating from written execution protocols and citing to the Angel Diaz execution in 2006 as one example, Valle also asserts inadequate qualifications, certification, training, and experience of execution team members, inadequate monitoring of the IV lines, and the DOC’s failure to conduct a meaningful review and certification of its process.
 

 Because Valle agrees that other than replacing sodium thiopental with pentobarbital, the DOC’s June 2011 protocol is identical to the August 2007 lethal injection protocol that this Court upheld in
 
 Lightboume,
 
 the circuit court did not err in summarily denying this portion of Valle’s claim. The factual circumstances surrounding the execution of Diaz were thoroughly litigated in
 
 Lightboume,
 
 and since that time, there have been five executions without subsequent allegations of newly discovered problems with Florida’s lethal injection process.
 
 See Tompkins v. State,
 
 994 So.2d 1072, 1081-82 (Fla.2008) (affirming summary denial of challenge to lethal injection procedures and noting that after the
 
 Lightboume
 
 decision, two executions had been conducted in Florida with no subsequent allegations of problems giving rise to the investigations following the Diaz execution). The remaining aspects of the protocol to which Valle currently takes issue were rejected on the merits in
 
 Lightbourne,
 
 969 So.2d at 350-53, and in subsequent cases.
 
 See, e.g., Baze,
 
 553 U.S. at 53-61, 128 S.Ct. 1520 (rejecting claims regarding the inadequate adminis tration of the lethal injection protocol, the risk that the procedures will not be properly followed, the absence of additional monitoring by trained personnel, inadequate training, issues with the placement and monitoring of IV lines, the lack of
 
 *546
 
 professional medical experience, and the need for a significant consciousness test);
 
 Troy v. State,
 
 57 So.3d 828, 839-40 (Fla.2011) (rejecting Troy’s claims regarding deficiencies in Florida’s lethal injection protocol including that the protocol fails to require that the execution team and the medical personnel who perform lethal injection have appropriate training, credentials, and supervision, fail to require adequate record-keeping and an adequate review and certification process, and fail to require adequate standards to manage complications inherent in the procedure).
 
 [16]
 

 As recognized above, the
 
 Baze
 
 standard requires proof that Florida’s lethal injection procedures are sure or very likely to cause serious illness and needless suffering or will result in a substantial risk of serious harm.
 
 See
 
 553 U.S. at 50, 128 S.Ct. 1520. After reviewing the evidence and testimony presented below, we conclude that Valle has failed to satisfy the “heavy burden” that Florida’s current lethal injection procedures, as implemented by the DOC, are constitutionally defective in violation of the Eighth Amendment of the United States Constitution. We thus affirm the circuit court’s orders.
 

 Evidentiary Rulings
 

 Based upon several adverse evidentiary rulings the circuit court made during the relinquishment period, Valle argues that he was denied a full and fair evidentiary hearing. We disagree and find no error in the circuit court’s rulings.
 

 Valle first argues that the circuit court improperly excluded seven witnesses employed by the DOC whose testimony he wished to present during the evidentiary hearing to discuss the “safety and efficacy” of pentobarbital in executions.
 
 [17]
 
 He supports this claim, however, by misconstruing our order of relinquishment. “It is well settled that ‘[t]he admissibility of evidence is within the sound discretion of the trial court, and the trial court’s determination will not be disturbed on appellate review absent a clear abuse of that discretion.’ ”
 
 Rimmer v. State,
 
 59 So.3d 763, 774 (Fla.2010) (quoting
 
 Brooks v. State,
 
 918 So.2d 181, 188 (Fla.2005)). The court granted the State’s motion to strike the defense’s witnesses on the grounds that the testimony was not relevant, citing the narrow scope of this Court’s relinquishment order. We agree and hold that the circuit court did not abuse its discretion.
 

 By the order’s express terms, we relinquished jurisdiction “for the narrow purpose of holding an evidentiary hearing solely on Valle’s claim regarding the efficacy of pentobarbital as an anesthetic in the amount prescribed by Florida’s protocol” and prohibited Valle from raising any other claims.
 
 Valle v. State,
 
 70 So.3d 525 (Fla.2011). This Court’s concern focused on evidence relating to whether the drug
 
 *547
 
 would sufficiently render an inmate unconscious before the administration of the last two drugs in the three-drug sequence. Valle has failed to establish how his witnesses — who he alleges would have testified regarding the DOC’s response after receiving letters from Lundbeck, the source of pentobarbital, or the procedure by which the DOC assesses consciousness during an execution — were relevant to the narrow purpose of the evidentiary hearing. As noted above, this Court agrees with the circuit court’s conclusion that the Lund-beck letters are of no legal value and irrelevant to our Eighth Amendment inquiry. Accordingly, the circuit court did not abuse its discretion in striking Valle’s witnesses.
 

 Next, Valle argues that the circuit court improperly excluded the affidavits of two reporters, Greg Bluestein and Eddie Ledbetter. Attached to these affidavits were newspaper articles written by the affiants chronicling their eyewitness accounts of the Blankenship execution. Regardless of the information contained therein, these items constitute inadmissible hearsay.
 
 See Robinson v. State,
 
 707 So.2d 688, 691 (Fla.1998) (holding that codefen-dant’s affidavit recanting testimony and proffered by the defendant constituted inadmissible hearsay because the codefen-dant failed to appear at' the hearing and affidavit did not come within any hearsay exception);
 
 Dollar v. State,
 
 685 So.2d 901, 903 (Fla. 5th DCA 1996) (“A newspaper article, introduced to prove the truth of out of court statements contained therein, constitutes inadmissible hearsay.”). Although Valle generally references the journalistic privilege and the manner in which to authenticate business records, he fails to explain why these documents do not constitute hearsay or fall within any applicable hearsay exception. Thus, we conclude that the circuit court did not abuse its discretion in excluding these items from consideration.
 

 Lastly, Valle contends that because the circuit court excluded the Bluestein and Ledbetter affidavits, the court erred in allowing the State to present the testimony of John Harper and Dr. Jacqueline Martin, both of whom gave eyewitness accounts of the Blankenship execution. Valle sought to strike these witnesses, asserting that their sole purpose was to rebut the defense’s affidavits, which were not admitted into evidence. In his lethal injection claim, however, Valle candidly acknowledges that he presented evidence regarding Blankenship’s execution through Dr. Waisel, who relied on Bluestein’s and Ledbetter’s reports in forming his opinion. Contrary to Valle’s contention, the State’s witnesses did not become irrelevant after the exclusion of the Bluestein and Ledbetter affidavits; instead, their testimony served to rebut Dr. Waisel’s account of the execution. Accordingly, the circuit court did not abuse its discretion in denying Valle’s motion to strike the State’s witnesses.
 

 Denial of Public Records Requests
 

 In conjunction with Valle’s challenge to Florida’s lethal injection procedures, we next address his contention that the circuit court erred in denying his various requests for public records needed to establish this claim. Specifically, Valle challenges the circuit court’s denial of his request for records from the DOC, the Office of the Attorney General, the Office of the Governor, and the Florida Department of Law Enforcement (FDLE). He asserts that compliance with such records requests was essential to obtain information regarding Florida’s lethal injection procedures.
 

 The circuit court granted, in part, Valle’s demands for public records. As a result, Valle was provided with information regarding the substitution of the first drug and how the new procedures would be
 
 *548
 
 implemented. The State provided Valle’s counsel with a copy of the new lethal injection protocol, which sets forth in detail how the drug is to be administered. Valle was also provided with training logs for execution trainings that occurred in 2010 and 2011, with the most recent exercise occurring in May 2011. In compliance with the circuit court’s order, the Office of the Governor provided records to Valle regarding that agency’s approval and review of changes to the protocol.
 
 [18]
 
 The records disclosed included the following: a November 18, 2010, affidavit from Dr. Dershwitz criticizing Dr. Waisel’s opinion; an expert report authored by Dr. Dershwitz in which he opines that there is negligible risk that if five grams of pentobarbital are administered, the inmate would experience any pain and suffering associated with the administration of the subsequent two drugs; and research studies regarding the use of high-dose barbiturate therapy, and in particular, pentobarbital. The DOC also provided Valle with records pertaining to the 2007 and 2011 lethal injection procedures and various checklists regarding the procedure for executing a condemned inmate.
 

 While the State did disclose many records, Valle contends that further disclosures will assist him in establishing an Eighth Amendment violation because they will essentially reveal the following: (1) that sodium thiopental and pentobarbital were illegally obtained or from a foreign country, casting doubt on the deference this Court bestows upon the executive branch to carry out executions in a humane and competent manner; and (2) deviations from protocol when the DOC administered the previous five executions.
 
 [19]
 
 Valle has failed to establish how the production of such records relates to a color-able Eighth Amendment challenge.
 

 Florida Rule of Criminal Procedure 3.852(i)(2), which limits postconviction requests for additional records, requires production of public records upon a finding of the following:
 

 (A) collateral counsel has made a timely and diligent search of the records repository;
 

 (B) collateral counsel’s affidavit identifies with specificity those additional public records that are not at the records repository;
 

 (C) the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence; and
 

 (D) the additional records request is not overly broad or unduly burdensome.
 

 The circuit court has the discretion to deny public records requests that are “overly broad, of questionable relevance, and un
 
 *549
 
 likely to lead to discoverable evidence.”
 
 Moore v. State,
 
 820 So.2d 199, 204 (Fla. 2002). As this Court has emphasized, rule 8.852 “is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postcon-viction relief.”
 
 Id.
 
 (quoting
 
 Glock v. Moore,
 
 776 So.2d 243, 258 (Fla.2001)). This Court reviews the circuit court’s denial of a public records request for an abuse of discretion.
 
 Hill v. State,
 
 921 So.2d 579, 584 (Fla.2006).
 

 With respect to Valle’s assertion that undisclosed records could show that sodium thiopental and pentobarbital were obtained from a foreign country, such information would be of questionable relevance, and he has failed to demonstrate how its disclosure would relate to a color-able Eighth Amendment claim. First, any allegations regarding the obtainment of sodium thiopental are irrelevant to the instant litigation since sodium thiopental is no longer part of Florida’s lethal injection protocol and will not be used in Valle’s execution. Second, as to the DOC’s procurement of pentobarbital, the Supreme Court recently announced that “speculation cannot substitute for evidence that the use of the drug is
 
 ‘sure or very likely
 
 to cause serious illness and needless suffering.’ ”
 
 Landrigan,
 
 131 S.Ct. at 445 (quoting
 
 Baze,
 
 553 U.S. at 50, 128 S.Ct. 1520);
 
 see id.
 
 (vacating a stay of execution that was based upon a finding that the condemned inmate had a substantial likelihood of success on the merits of his claim that the use of sodium thiopental by a foreign source and not approved by the FDA creates a substantial and unnecessary risk of serious harm in violation of the Eighth Amendment). In requesting these materials, Valle simply posits a hypothetical argument, but he does not explain why these facts will result in a substantial risk of serious harm.
 

 As to Valle’s requests for records to demonstrate that pentobarbital may have been procured illegally, his pleadings in this regard are speculative and conclusory. Because he has failed to allege how this information would lead to evidence related to his claim, Valle’s requests on this issue appear to be no more than a “fishing expedition” for which rule 3.852 is not intended. Consequently, the circuit court did not err in denying Valle’s requests to produce these records.
 

 Valle also requests records on the DOC’s administration of executions for the last five inmates executed. Instead of asserting why this information would be relevant to proving a substantial risk of serious harm, Valle points to the botched execution of Angel Diaz and contends that such documentation is essential for establishing deviations from the protocol and why this Court cannot presume the DOC is acting in accordance with its protocol as written. As noted above, in
 
 Baze,
 
 the Supreme Court expressly rejected the prisoners’ argument that the risk that a state would not properly follow its protocol constitutes an Eighth Amendment violation,
 
 see
 
 553 U.S. at 53-54, 128 S.Ct. 1520, and we thoroughly considered the factual circumstances surrounding the Diaz execution in
 
 Lightboume.
 
 Therefore, the records sought are not related to a colorable Eighth Amendment claim, and the circuit court did not err in denying Valle’s requests.
 

 Denial of Clemency Proceeding
 

 In his next claim, Valle contends that he was denied a clemency proceeding and effective assistance of clemency counsel to which he is entitled.
 
 [20]
 
 We affirm the cir
 
 *550
 
 cuit court’s denial of relief because this claim is speculative and insufficiently pled.
 

 Valle acknowledges that a clemency hearing was requested by Governor Chiles on February 6, 1992, and that it appears attorney Mark Evans was appointed to represent him during the clemency proceeding. He argues, however, that there is no indication that any clemency investigation or proceeding was actually conducted “[d]ue to changes in policies and procedures instituted by Governor Chiles in the early 1990s.” Valle’s assertion that no clemency proceeding was ever conducted is based on the fact that he does not have any files showing that a proceeding was ever held. However, he acknowledges that clemency counsel was appointed and that he does not have clemency counsel’s files.
 

 Valle’s inability to determine whether he was given a clemency proceeding or whether attorney Evans did in fact represent him appears to be the result of Valle’s failure to adequately investigate and present the factual basis for this claim. Although Valle complains that he requested records regarding the clemency investigations and that he cannot more fully plead these facts because he was denied access to those records, he does not assert to this Court that the circuit court erred in sustaining agency objections or that he was improperly denied public records to which he was entitled.
 
 [21]
 
 Rather, Valle speculates that no clemency proceeding was held because Governor Chiles subsequently changed the policies and procedures and no records reflect that a proceeding was held. However, “[p]ost-conviction relief cannot be based on speculation or possibility.”
 
 Maharaj v. State,
 
 778 So.2d 944, 951 (Fla.2000). His alternative claim — that if a proceeding was held, it was not conducted according the executive rules and he was not allowed to participate — is also insufficiently pled. Valle does not allege a factual basis for this claim other than the above lack of records.
 

 As with his previous clemency allegation, Valle’s claim that he was denied effective representation at his clemency proceeding because clemency counsel was incompetent or ineffective is vague and conclusory. Valle does not allege any facts to support this claim, and the documents attached to the postconviction motion do not pertain to Evans’ representation of Valle, nor do they support this claim.
 
 [22]
 
 Again, “[pjostconviction relief cannot be based on speculation or possibility,”
 
 Maharaj,
 
 778 So.2d at 951, and “vague and conclusory allegations on appeal are insufficient to warrant relief,”
 
 Doorbal v. State,
 
 983 So.2d 464, 482 (Fla.2008).
 

 As his final clemency-related claim, Valle argues that, assuming a clemency proceeding was conducted pursuant to Governor Chiles’ original request, it did not serve the “fail-safe” purposes for which clemency is intended because it was done before his postconviction proceedings. In
 
 Johnston v. State,
 
 27 So.3d 11, 24 (Fla.),
 
 *551
 

 cert, denied,
 
 — U.S.-, 131 S.Ct. 459, 178 L.Ed.2d 292 (2010), we squarely rejected this claim:
 

 Johnston next contends that the clemency proceeding he was provided in 1987 was inadequate because it was held before the postconviction proceedings were concluded and before his mental health issues and life history were fully developed for consideration in the clemency process.... Johnston argues that clemency in Florida does not provide the “fail safe” that clemency is envisioned to be by the United States Supreme Court.... We conclude that the clemency system in Florida performed as intended in providing a “fail safe” for Johnston. He was given a full clemency hearing in 1987 at which he was represented by counsel. When the death warrant was signed on April 20, 2009, it stated that “it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate.” Thus, clemency was again considered by the executive branch prior to the signing of the warrant in this case.
 

 Accordingly, we affirm the circuit court’s summary denial of relief on all aspects of this claim.
 

 The Governor’s Discretion to Sign Death Warrants
 

 Next, Valle asserts that Florida’s death penalty structure violates the Eighth and Fourteenth Amendments because by being able to sign a death warrant, the Governor has the absolute discretion to decide who lives and who dies. This, Valle contends, is contrary to the Eighth Amendment requirement that there be a principled way to distinguish between who is executed and who is not. In
 
 Marek v. State,
 
 8 So.3d 1123, 1129-30 (Fla.2009), we rejected a similar constitutional challenge to Florida’s clemency process and declined to “second-guess” the application of the exclusive executive function of clemency. While our decision in
 
 Marek
 
 was pending, Marek filed another successive postconviction motion, specifically contending that the manner in which the Governor determined that a death warrant should be signed was arbitrary and capricious. This Court affirmed the denial of relief, explaining in more detail:
 

 Marek argues that Florida’s clemency process,
 
 particularly the Governor’s authority to sign warrants,
 
 is unconstitutional because it does not provide sufficient due process to the condemned inmate. He asserts that public records documenting that the Governor reviewed Marek’s case in September 2008 without input from Marek demonstrate that he was denied due process. Ma-rek contends that because he did not obtain the public records until April 27, 2009, he could not have raised this claim in a prior proceeding. However, Marek did raise this claim in his second successive postconviction proceeding.
 
 In that proceeding, Marek analogized the Governor’s decision to sign his death warrant to a lottery
 
 and contended that Florida’s clemency process was one-sided, arbitrary, and standardless. This Court rejected Marek’s challenges as meritless. The current claim raises the same legal challenge this Court previously considered.
 

 Marek v. State,
 
 14 So.3d 985, 998 (Fla.) (emphasis added) (citation omitted) (citing
 
 Marek,
 
 8 So.3d at 1129-30),
 
 cert. denied,
 
 - U.S. -, 130 S.Ct. 40, 174 L.Ed.2d 625 (2009).
 

 In essence, Valle raises a claim similar to Marek’s and is asking this Court to second-guess the Governor’s decision in determining
 
 when
 
 to sign Valle’s death warrant because other inmates were also eligible for a death warrant. However,
 
 *552
 
 this Court has always proceeded very carefully in addressing such a claim since it triggers separation of powers concerns.
 
 See, e.g., Johnston,
 
 27 So.3d at 26 (“[W]e decline to depart from the Court’s precedent, based on the doctrine of separation of powers, in which we have held that it is not our prerogative to second-guess the executive on matters of clemency in capital cases.”);
 
 In re Advisory Opinion of the Governor,
 
 334 So.2d 561, 562-63 (Fla.1976) (“This Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government.”). Here, Valle has not provided any reason for this Court to depart from its precedents, and we therefore affirm the circuit court’s denial of relief.
 

 Length of Time on Death Row
 

 Valle next contends that the circuit court erred in summarily denying his claim that the thirty-three years he has spent on death row constitutes cruel and unusual punishment.
 
 [23]
 
 Under this Court’s clear precedent, Valle’s claim is facially invalid, and the circuit court did not err in summarily denying relief. In
 
 Tompkins,
 
 this Court observed that “no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay.” 994 So.2d at 1085 (quoting
 
 Booker v. State,
 
 969 So.2d 186, 200 (Fla.2007)). In line with
 
 Tompkins,
 
 this Court has repeatedly held this claim to be meritless. ‘
 
 See, e.g., id.
 
 (rejecting claim that twenty-three years on death row constituted cruel and unusual punishment);
 
 Booker,
 
 969 So.2d at 200 (rejecting claim that almost thirty years on death row constituted cruel and unusual punishment);
 
 Gore v. State,
 
 964 So.2d 1257, 1276 (Fla. 2007) (rejecting claim that twenty-three years on death row constituted cruel and unusual punishment);
 
 Rose v. State,
 
 787 So.2d 786, 805 (Fla.2001) (holding as without merit cruel and unusual punishment claim of death row inmate under death sentence since 1977).
 

 Furthermore, while Valle asserts that the State repeatedly botched his trials and resentencings during his first ten years on death row, thereby extending the length of his incarceration, he has contributed to the remaining twenty-three years of delay in his execution. Since his death sentence became final in 1991, Valle has continued to exercise his constitutional rights in challenging his convictions and sentence. He filed a postconviction motion in state court, multiple habeas petitions in this Court, and a habeas petition in federal court, the denial of which was affirmed on appeal in 2006. Valle “cannot now contend that his punishment has been illegally prolonged because the delay in carrying out his sentence is in large part due to his own actions in challenging his conviction[s] and sentence.”
 
 Tompkins,
 
 994 So.2d at 1085. Therefore, the circuit court did not err in summarily denying Valle’s claim.
 

 Vienna Convention
 

 Lastly, Valle contends that because he is a Cuban national, the State’s failure to advise him of the right to notify his consulate of his arrest and to consult with that consulate or a diplomatic officer without delay under Article 36 of the Vienna Convention on Consular Relations entitles him to relief. This substantive claim is procedurally barred because Valle could and should have raised it on direct appeal.
 
 See, e.g., Lugo v. State,
 
 2 So.3d 1, 17
 
 *553
 
 (Fla.2008) (denying as procedurally barred allegation that arrest in the Bahamas by Bahamian police violated Article 36 of the Vienna Convention because the Bahamian police failed to contact the U.S. Consulate in the Bahamas or advise defendant of his right to contact that consulate since it could have been raised on direct appeal);
 
 Maharaj,
 
 778 So.2d at 959 (denying as procedurally barred allegation that State failed to comply with its international obligation to inform the consulate that a British citizen had been charged with a capital crime because it could and should have been raised on direct appeal);
 
 see also Medellin v. Texas,
 
 552 U.S. 491, 512 n. 8, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (citing
 
 Sanchez-Llamas v. Oregon,
 
 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), for the proposition that the Vienna Convention does not preclude the application of state procedural bars).
 

 Notwithstanding the procedural bar, Valle’s claim is also without merit. In
 
 Maharaj,
 
 this Court denied an identical claim on the merits where the defendant “failed to establish that he [had] standing” since “treaties are between countries, not citizens.” 778 So.2d at 959. Rather than arguing why
 
 Maharaj’s
 
 holding is inapplicable to the instant case, Valle instead points out that a federal bill has been proposed, but not yet signed into law, that would provide death row inmates a process by which to assert such a violation. In
 
 Garcia v. Texas,
 
 — U.S.-, 131 S.Ct. 2866, 180 L.Ed.2d 872 (2011), the Supreme Court rejected the same argument when denying an application for a stay of execution made by Humberto Leal Garcia, a Mexican national. Recognizing that international precedent mandating that a foreign national be advised of such rights would require legislative implementation, the Court denied the application for stay and held that “[t]he Due Process Clause does not prohibit a State from carrying out a lawful judgment in light of unenacted legislation that might someday authorize a collateral attack on that judgment.”
 
 Id.
 
 at 2867;
 
 see also Medellin v. Texas,
 
 554 U.S. 759, 760, 129 S.Ct. 360, 171 L.Ed.2d 833 (2008) (denying application for stay of execution when similar argument was advanced). Thus, under the authority of both
 
 Maharaj
 
 and
 
 Garcia,
 
 we conclude that the circuit court did not err in summarily denying relief on this claim.
 

 CONCLUSION
 

 In accordance with our analysis above, we affirm the circuit court’s denial of post-conviction relief. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately. We hereby lift the temporary stay imposed by this Court on July 25, 2011.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . In a prior decision, we succinctly summarized the procedural history as follows:
 

 Valle was convicted of first-degree murder, attempted murder, and possession of a firearm, and was sentenced to death for the murder charge.
 
 Valle v. State
 
 [
 
 (Valle
 
 I) ], 394 So.2d 1004 (Fla.1981). On direct appeal, this Court reversed the convictions and sentences and remanded for a new trial.
 
 Id.
 
 On retrial in 1981, Valle was again convicted on those three counts and again sentenced to death. The convictions and sentences were affirmed by this Court in
 
 Valle v. State [(Valle
 
 II)], 474 So.2d 796, 806 (Fla.1985). The United States Supreme Court subsequently vacated Valle’s death sentence and remanded the case to this Court for further consideration in light of
 
 Skipper v. South Carolina,
 
 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), regarding the admissibility of model prisoner testimony.
 
 Valle v. Florida,
 
 476 U.S. 1102, 106 S.Ct. 1943, 90 L.Ed.2d 353 (1986). We remanded for a new sentencing hearing before a new jury.
 
 Valle v. State
 
 [
 
 (Valle III)),
 
 502 So.2d 1225 (Fla.1987).
 

 Valle v. State (Valle V),
 
 705 So.2d 1331, 1332-33 (Fla.1997) (parallel citations omitted).
 

 [2]
 

 . Valle also pled guilty to automobile theft.
 
 See Valle I,
 
 394 So.2d at 1005.
 

 [3]
 

 . This Court reversed for an evidentiary hearing on the claim that counsel was ineffective for presenting model prisoner evidence and for failing to move for a mistrial and disqualification of the resentencing judge after the judge allegedly kissed the victim’s widow in front of the jury.
 
 See id.
 

 [4]
 

 . Pentobarbital is also known by its brand name, Nembutal.
 

 [5]
 

 .
 
 See Schwab v. State,
 
 995 So.2d 922, 924-33 (Fla.2008) (approving and adopting the trial court's analysis, which concluded that Florida's August 2007 lethal injection protocol was "substantially similar” to the Kentucky protocol at issue in the
 
 Baze
 
 decision).
 

 [6]
 

 . The circuit court permitted Valle to amend only his claim regarding the constitutionality of Florida's lethal injection procedures. His postconviction motion, as amended, raised the following claims: (1) he is being denied
 
 *537
 
 full and fair postconviction proceedings in violation of his right to due process as a result of the expedited process and truncated schedule set by the circuit court following the signing of his death warrant; (2) in light of the DOC’s change in the lethal injection protocol on June 8, 2011, substituting the drug pento-barbital for sodium thiopental, Florida’s lethal injection statute and the existing procedure the State utilizes for lethal injection are unconstitutional facially and as applied; (3) he was unconstitutionally denied a clemency investigation and proceedings and denied the assistance of counsel to prepare a clemency petition; (4) the arbitrary and standardless process by which the Governor signs a death warrant renders Florida’s capital sentencing scheme unconstitutional; (5) his thirty-three year incarceration on death row violates the Eighth Amendment and is prohibited under
 
 Lackey
 
 v.
 
 Texas,
 
 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995); and (6) as a Cuban national, he was deprived his right under Article 36 of the Vienna Convention of consular notification upon his arrest.
 

 [7]
 

 . Valle’s claims on appeal are largely duplica-tive of his postconviction claims and include the following: (1) he has-been denied access to public records to which he is entitled in violation of Florida Rule of Criminal Procedure 3.852 and Chapter 119, Florida Statutes; (2) Florida’s lethal injection procedures violate the Eighth Amendment prohibition against cruel and unusual punishment; (3) the circuit court erred in summarily denying his claim that he was denied a clemency investigation and proceeding and was denied the assistance of counsel to prepare for such a proceeding; (4) the circuit court erred in summarily denying his claim that the Governor’s arbitrary decision to sign a death warrant is unconstitutional; (5) the amount of time he has served on death row constitutes cruel and unusual punishment; and (6) as a Cuban national, he was deprived his right under Article 36 of the Vienna Convention of consular notification upon his arrest.
 

 [8]
 

 . Valle also argues that because the circuit court made erroneous evidentiary rulings during the relinquishment proceedings, he was denied a full and fair hearing.
 

 [9]
 

 . In
 
 Lightbourne,
 
 which predates the Supreme Court’s decision in
 
 Baze,
 
 this Court held that inmate Lightboume failed to establish that Florida’s August 2007 lethal injection protocol violated the Eighth Amendment since he did not show "a substantial, foreseeable or unnecessary risk of pain in the DOC’s procedures for carrying out the death penalty through lethal injection.”
 
 Lightboume,
 
 969 So.2d at 353. After
 
 Baze
 
 was decided, this Court rejected the notion that
 
 Baze
 
 required reconsideration of our decision in
 
 Lightboume
 
 and concluded that Florida's 2007 procedures passed constitutional muster under any of the risk-based standards.
 
 See Ventura v. State,
 
 2 So.3d 194, 200 (Fla.2009) (“Florida’s current lethal-injection protocol passes muster under
 
 any
 
 of the risk-based standards considered by the
 
 Baze
 
 Court (and would also easily satisfy the intent-based standard advocated by Justices Thomas and Scalia).”).
 

 [10]
 

 . Dr. Waisel testified that the Food and Drug Administration (FDA) approves the package insert, which accompanies a manufacturer’s drug as distributed. He further explained that the FDA approves the indications for a drug based on studies submitted by the drug's manufacturer.
 

 [11]
 

 . We note that the condemned inmates in
 
 Baze
 
 actually proposed a one-drug, barbiturate-only protocol, using either
 
 pentobarbital
 
 or sodium thiopental.
 
 See Baze,
 
 553 U.S. at 56-58, 128 S.Ct. 1520.
 

 [12]
 

 . Valle also overlooks the fact that the portion of Florida's lethal injection protocol ensuring that an inmate is unconscious prior to the administration of the second and third drugs has not been altered since we approved the August 2007 protocol in
 
 Lightboume.
 
 Under the current protocol, if the administration of pentobarbital does not render Valle unconscious, he will not be injected with the final two drugs, and the execution will be suspended until Valle is unconscious.
 

 [13]
 

 . To the extent Valle asserts that the use of pentobarbital creates a risk of serious harm in light of the fact that it may be from a foreign source or lacks FDA approval for use in lethal injections, we reject these claims, as other courts have similarly done.
 
 See Landrigan,
 
 131 S.Ct. at 445 (vacating a stay of execution that was based upon a finding that the inmate had a substantial likelihood of success on the merits regarding his claim that the use of sodium thiopental manufactured by a foreign source and not approved by the FDA created a substantial and unnecessary risk of serious harm);
 
 Cook v. Brewer,
 
 637 F.3d 1002, 1006-07 (9th Cir.2011) ("Cook relies on his allegations that Arizona’s sodium thiopental is imported and not approved by the FDA. But
 
 Landrigan ...
 
 advises that these facts are not sufficient to state a plausible Eighth Amendment claim.”). As to his claim that pentobar-bital may be procured illegally, we deny this claim as speculative and insufficiently pled since Valle has failed to allege how this fact
 
 *542
 
 would create a substantial risk of serious harm.
 

 [14]
 

 . Lundbeck’s April 21, 2011, letter to the DOC specifically provided as follows:
 

 Lundbeck is adamantly opposed to the use of Nembutal [i.e., pentobarbital], or any product for that matter, for the purpose of capital punishment.
 

 We recognize that we cannot control how licensed health care professionals use this or any pharmaceutical product. Nevertheless, we urge you to refrain from using Nembutal in the execution of prisoners in your state because it contradicts everything we are in business to do — provide therapies that improve people’s lives.
 

 In the company's June 8, 2011, letter to the DOC, Lundbeck stated that ”[t]he use of pen-tobarbital outside of the approved labeling has not been established” and that "Lundbeck cannot assure the associated safety and efficacy profiles in such instances,” causing "concern[] about its use in prison executions.”
 

 A May 16, 2011, letter from Lundbeck to Governor Scott referencing a letter it had previously sent to the DOC noted that the DOC had failed to respond to its letter and requested that the Governor take immediate action to stop the use of pentobarbital as a means to end lives. A June 8, 2011, letter to Governor Scott is duplicative of the June 8 letter Lundbeck sent to the DOC.
 

 Valle also alleges that Lundbeck published position papers to the same effect.
 

 [15]
 

 . In reaching his opinion on this matter, Dr. Waisel relied on the following collateral information: (1) an affidavit and interview of Greg Bluestein, a reporter who witnessed the execution; (2) affidavits of other purported eyewitnesses who were also reporters, including Eddie Ledbetter and Mitchell Pearce; (3) the 2007 and 2011 Florida lethal injection protocols; (4) letters from Lundbeck; and (5) affidavits described as being from Georgia Department of Corrections employees or other state officials, without further elaboration.
 

 [16]
 

 . To the extent that Valle's claims are not duplicative of those in
 
 Lightbourne
 
 and later cases, we conclude that Valle "is not entitled to relief under the analogous and comprehensive analysis we undertook in
 
 Lightbourne." Troy,
 
 57 So.3d at 840. In
 
 Troy,
 
 we reaffirmed the principle that "[a] claim that the protocol can be improved and the potential risks of error reduced can always be made,” but "this Court's role is not to micromanage the executive branch in fulfilling its own duties relating to executions.”
 
 Id.
 
 (quoting
 
 Lightbourne,
 
 969 So.2d at 351).
 

 [17]
 

 . In his amended witness list, Valle sought to elicit testimony from the following individuals: (1) Russell Hosford, who is alleged to be the Director of the Office of Institutions for DOC; (2) Jennifer Parker, who is employed by the DOC; (3) Timothy Cannon, who is alleged to be the execution team leader for lethal injection executions; (4) Edwin Buss, who is the Secretary of the DOC; (5) Rana Wallace, who is employed by the DOC; (6) the primary executioner; and (7) the secondary executioner.
 

 [18]
 

 . The Office of the Attorney General represented that it did not have records regarding the constitutionality of the procedures leading up to the promulgation of the June 2011 protocol.
 

 [19]
 

 . Valle’s contention that the disclosure of records will reveal letters from the drug's manufacturer to State agencies regarding its concern over the safety of using pentobarbital in executions is now moot. In our order of relinquishment, we directed the DOC to produce these documents, and the DOC complied with this Court's order.
 

 Additionally, the record directly refutes Valle’s claim that there is a lack of evidence showing that the State conducted research into the efficacy of pentobarbital prior to its implementation. The State disclosed its records detailing a medical doctor’s opinion on the use of the drug and research articles about such drugs. Those documents are dated November 2010, and the new protocol went into effect over six months later in June 2011.
 

 [20]
 

 . Valle moved to amend his postconviction motion as to this claim, but the circuit court denied leave to amend.
 

 [21]
 

 . He does not assert any error with respect to clemency records in either this claim or his public records claim.
 

 [22]
 

 . The attached documents were the following: (a) a letter from attorney Evans in 1993 to then-Chief Justice Barkett concerning complaints filed by two former clients, Robert Heiney and James Card, and which explains that the complaints arose from a misunderstanding; (b) a copy of a letter from Heiney and Card stating that they were "tricked” into withdrawing from a case by Evans; and (c) a copy of a civil complaint filed by Card, Hei-ney, and Amos King, which alleged that they were tricked into requesting the courts to appoint Evans as their attorney and which requested $100,000 in compensatory damages and $100,000 in punitive damages.
 

 [23]
 

 . Valle also moved to amend his postconviction motion as to this claim, but the circuit court denied leave to amend.